STATE, RESPONDENT, v. JUHREY, APPELLANT.

(No. 4,903.)

(Submitted October 28, 1921.  Decided November 28, 1921.)

[202 Pac. 762.]

*Criminal Law—Homicide—Jurors — Voir Dire Examination —
Reading Newspaper Reports—Evidence—Cross-examination—
Hearsay.*

Homicide — Jurors — Opinion Founded on Newspaper Reports — Not Dis-
qualification.
1. A juror who on his *voir dire* stated that he had read in the
newspapers an account of the homicide for which plaintiff was on
trial; that he had formed an opinion therefrom which it would take
evidence to remove, but that in determining the case he would base
his verdict upon the evidence and be bound by the court's instruc-
tions; that there was nothing known to him why he could not try
the case fairly, *etc.*, *held* competent.

Same—Jurors—*Voir Dire* Examination—Contradictory Answers—Discre-
tion.
2. Where a juror on his *voir dire* examination gives contradictory
answers, it is the function of the trial court to pass upon the evi-
dence and determine the qualifications of the juror, its determination
being final unless it appears that there has been abuse of discretion.

Same—Witnesses—Cross-examination—Curtailment, When not Reversible
Error.
3. Where a witness for the state had been cross-examined at great
length as to her relations with defendant, refusal to allow a further
question on the same subject to be answered was not reversible error.

Same—Evidence—Conversation With Deceased—Hearsay.
4. A question whether witness had a conversation with deceased in
his lifetime concerning him (deceased) and his wife, was properly
excluded as immaterial and hearsay.

Same—Evidence—Sufficiency.
5. Evidence *held* sufficient to warrant conviction of murder in the
first degree.

*Appeals from District Court, Silver Bow County; J. J.
Lynch, Judge.*

ASSAD JUHREY, charged under the name of M. A. Juhrey,
was convicted of murder in the first degree, and appeals

---

1. Authorities passing on the question of opinion gained from reading
paper as disqualification of juror in criminal case are collated in a note
in 35 L. R. A. (n. s.) 984.

from the judgment of conviction and from the order overruling his motion for a new trial. Affirmed.

*Messrs. Canning & Geagan,* for Appellant, submitted a brief and argued the cause orally.

The action of the court in accepting the juror, Davis, as a member of the trial jury and overruling the defendant's challenge for cause was an abuse of discretion on the part of the court, which prejudiced the substantial rights of this defendant and prevented him from having a fair trial by an impartial jury as provided by law. We think the rule is that a man with a condition of mind such as the juror, Davis, showed by his examination that his mind was in is not an impartial juror within the constitutional sense of that term. The rule, we take it, in such cases as this, has been very properly stated by the supreme court of the state of Illinois in the case of *Coughlin* v. *People,* 144 Ill. 140, 19 L. R. A. 57, 33 N. E. 1.

It must be borne in mind at all times in passing upon the qualifications of a juror, in such a case as this, that his impartiality is to be judged of in the constitutional sense. The statute permitting the qualification of jurors who have formed opinions under certain circumstances must not be construed in any other sense than as a means of effectuating the constitutional requirements, *viz.,* an impartial jury. It must not be taken that the statute determines in any way what shall be the probative force of the statement of the juror, or how far it shall have the effect of relieving him from disqualifications that arise from existence in his mind of the opinion. His statements are to be taken as constituting evidence which is to be weighed under all the rules of evidence and given such consideration as it is justly and fairly entitled to receive. This evidence must be of such nature that the court, resolving all doubt in favor of the prisoner, must be satisfied of its truth and that it establishes the competency of the juror beyond a reasonable doubt. (*State* v. *Brooks,*

57 Mont. 480, 188 Pac. 942; *Scribner* v. *State,* 3 Okl. Cr. 601, 35 L. R. A. (n. s.) 985, 108 Pac. 422; *Coughlin* v. *People, supra;* see, also, *People* v. *Riggins,* 159 Cal. 113, 112 Pac. 862.)

The court in sustaining the objection to the question, "What did you mean by being through with him?" is an instance that illustrates well the rule of this state that there should be a wide latitude allowed in cross-examination. Such error is prejudicial, as it prevents a full investigation of the truth, and is undue limitation upon the right of cross-examination. (*State* v. *Wakely,* 43 Mont. 427, 117 Pac. 95; *State* v. *Rhys,* 40 Mont. 131, 105 Pac. 494; *State* v. *Howard,* 30 Mont. 518, 77 Pac. 50; *State* v. *Rogers,* 31 Mont. 1, 77 Pac. 293; *Territory* v. *Garcia,* 15 N. M. 538, 110 Pac. 838; *Sayres* v. *Allen,* 25 Or. 211, 35 Pac. 254.)

The evidence does not sustain the verdict of guilty of murder in the first degree, for there is no testimony worthy of belief that establishes any premeditation sufficient to be found as existing by the jury. The only witness' testimony that has any tendency to establish premeditation on the part of the defendant is the testimony of the witness, May Gibson, in her statement attributed to the defendant in the following words: "I have come to kill the two of youse." We respectfully submit that this statement in the light of this witness' own testimony is not, and could not be, worthy of belief, for without attempt to leave the house or to get away from the defendant, although she was in a neighborhood where people resided all about her, she remained in the house with him without making any of these attempts from the time of his coming until Gibson came, which was a period of from twenty minutes to half an hour. To properly view this statement of hers and the proper value that should be given to it under the circumstances, it is necessary to read her testimony both on direct and cross-examination contained in the transcript. (*State* v. *McMillan,* 20 Mont. 407, 51 Pac. 827; *Escallier* v. *Great Northern Ry. Co.,* 46 Mont. 238, Ann. Cas. 1914B,

468, 127 Pac. 458; *State* v. *Trego,* 25 Idaho, 625, 138 Pac. 1124; *State* v. *Pippi* (Mont.), 195 Pac. 556; *Casey* v. *Northern Pac. Ry. Co.* (Mont.), 198 Pac. 141.)

*Mr. Wellington D. Rankin,* Attorney General, *Mr. L. A. Foot,* Assistant Attorney General, and *Mr. George Bourguin,* County Attorney for Silver Bow County, submitted a brief in behalf of Respondent; *Mr. Foot* and *Mr. Bourguin* argued the cause orally.

The formation and expression of an opinion is not *per se* actual bias on the part of a juror. Actual bias is the existence of a state of mind, on the part of a juror, which leads to a just inference that he will not act with entire impartiality in the case. (16 R. C. L., sec. 80, p. 263.)

In the instant case, Juror Davis had never expressed any opinion, although he admitted that he had formed one from the newspaper reports of the case at the time of the homicide. Statutes of the character of section 9264, Revised Codes, are not in conflict with a constitutional provision that "the accused shall have the right to public · trial by an impartial jury." (*State* v. *Howard,* 30 Mont. 518, 77 Pac. 50; *State* v. *Russell,* 13 Mont. 164, 32 Pac. 854; *State* v. *Sheerin,* 12 Mont. 539, 33 Am. St. Rep. 600, 31 Pac. 543; *Territory* v. *Bryson,* 9 Mont. 32, 22 Pac. 147; *Coughlin* v. *People,* 144 Ill. 140, 19 L. R. A. 57, 33 N. E. 1; *State* v. *Megorden,* 49 Or. 259, 14 Ann. Cas. 130, 88 Pac. 306; *Hopt* v. *Utah,* 120 U. S. 430, 30 L. Ed. 708, 7 Sup. Ct. Rep. 614 [see, also, Rose's U. S. Notes]; *Stout* v. *State,* 90 Ind. 1; *Ex parte Spies,* 123 U. S. 131, 31 L. Ed. 80, 8 Sup. Ct. Rep. 21, 22 [see, also, Rose's U. S. Notes].) In the case of *Shane* v. *Butte Electric Ry. Co.,* 37 Mont. 599, 97 Pac. 958, which was an action for personal injury, a juror was accepted by the court under the provisions of section 9264, *supra.* This court held that the statute did not apply to a civil action, as the rule of the common law had not been changed regarding

civil practice, but stated that if this were a criminal case it would apply.

MR. CHIEF COMMISSIONER POORMAN prepared the opinion for the court.

This is an appeal by defendant from a judgment entered upon a verdict of a jury finding defendant guilty of murder in the first degree, and also from an order of the court overruling defendant's motion for a new trial. The questions raised by the assignment of error relate to the qualifications of a juror, alleged misconduct of the jury, sufficiency of the evidence to sustain the verdict, and the acts of the court in sustaining objections to the admission of evidence.

The defendant claims prejudicial error by reason of the act [1] of the court in overruling his challenge for cause to the juror William Davis. The challenge was made on the ground that the juror "has a condition of mind by which the defendant and state could not have a fair and impartial trial." On his *voir dire* examination by the county attorney, the juror stated that he had read an account of the case in the newspapers; that he had not talked with anyone who purported to know the facts of the case; that he had formed an opinion from what he had read in the newspapers; that it would take some evidence to remove the opinion thus formed, but that in determining the case he would base his verdict upon the evidence as he heard it from the witnesses on the witness-stand. The juror further stated that he would feel bound by the court's instructions, which he would follow; had never seen the defendant before; that he entertained no conscientious scruples against the infliction of the death penalty as punishment for murder in the first degree in a proper case; that there was nothing known to him why he could not try the case fairly, and he would do so if retained as a juror, and base his verdict solely upon the evidence as he heard it during the course of the trial. The juror was examined at great length by counsel for defendant, and the court would

occasionally ask him a question, but the juror repeatedly, during this examination, stated that he would fairly try the case on the evidence produced at the trial. In answer to some of the questions asked him during the course of the extended examination, he made statements which, if standing alone, would indicate a fixed opinion amounting to prejudice. After the completion of the examination of the jurors, the court again examined the juror William Davis as to his qualifications, and the juror again stated that he would disregard any previous opinion, would follow the evidence given at the trial, would obey the instructions of the court, would fairly and impartially and honestly try the case, and that, if he were charged with the crime of murder, he would be willing to have a jury of twelve men of like mind with himself sit upon the case.

Under the provisions of section 9264, Revised Codes, a juror is not disqualified by reason of having formed or expressed an opinion founded upon public rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration under oath, that he can and will, notwithstanding such opinion, act fairly and impartially upon the matter to be submitted to him. The general rule under similar statutes seems to be that: "The fact that a person called as a juror has formed an opinion or impression shall not disqualify him to serve as a juror in such case if he shall, upon oath, state that he believes he can fairly and impartially render a verdict therein in accordance with the law and evidence and the court shall be satisfied of the truth of such statements." (16 R. C. L., sec. 81, p. 264; *Leigh* v. *Territory,* 10 Ariz. 129, 85 Pac. 948; *State* v. *Megorden,* 49 Or. 259, 14 Ann. Cas. 130, 88 Pac. 306; *Scribner* v. *State,* 3 Okl. Cr. 601, 35 L. R. A. (n. s.) 985, 108 Pac. 422; *People* v. *Ryan,* 152 Cal. 364, 92 Pac. 853; *People* v. *Loper,* 159 Cal. 6, Ann. Cas. 1912B, 1193, 112 Pac. 720; *People* v. *Wolff,* 182 Cal. 728, 190 Pac. 22; *State* v. *Milosovich,* 42 Nev. 263, 175 Pac. 139; *State* v. *Anderson,* 24 N. M. 360, 174 Pac. 215; *Smith* v. *State,* 14

Okl. Cr. 250, 174 Pac. 1107; *Forte* v. *People,* 57 Colo. 450, 140 Pac. 789; *State* v. *Williams,* 28 Nev. 395, 82 Pac. 353.)

In this latter case, the supreme court of Nevada, in discussing the qualifications of a juror, said: "In this era of education, intelligence, and diffusion of knowledge, when the telegraph and cable flash information from the most distant parts of the earth in a few seconds, when an army of men are employed in gathering and reporting the important happenings of the world, and improved printing presses, invented and operated by ingenious minds and cunning hands, are publishing millions of papers daily, the man who does not read and think and form opinions regarding such crimes as murders committed in his locality is better fitted to have lived in the Dark Ages than to serve on juries in the twentieth century. Still, in order to be a good juror, any opinion he may have must be a qualified one, and he must conscientiously feel that he can discard it in arriving at a verdict, and realize that under our system of jurisprudence persons charged with crime are not to be prejudged or convicted upon newspaper reports or hearsay, or found guilty by anything excepting evidence introduced in court under the sanctity of an oath or in conformity to legal practice."

In *People* v. *Loper,* 159 Cal. 6, Ann. Cas. 1912B, 1193, 112 Pac. 720, 722, the court, in passing upon the qualifications of a juror, said: "The statements of those called for jury duty in this case seem quite typical of those given during the selection of a jury in any case about which there has been extensive comment in the daily journals. Almost every person called into the jury-box had an opinion of defendant's guilt, based upon what he had read, and some of them stated that such opinion would require evidence for its removal. When, however, they were put to the test of their ability to try the case upon the evidence produced at the trial and uninfluenced by other considerations, each answered that he could and would, if chosen, act fairly and impartially. It was the function of the trial court to determine the true state

of mind of each member of the panel who was questioned touching his qualifications to serve as a juror. Frequently there is a conflict between different portions of the testimony given during an examination on *voir dire,* due not always to the lack of candor on the part of the person examined, but to his misunderstanding of the questions asked and of the duties of a juror, until such duties are explained by the court. When such conflict occurs, the trial court must decide, if possible, which of the answers most truly reveals the state of the talesman's mind. In other words, the questions generally presented are those of fact and not of law''—citing many cases.

In a previous decision, the supreme court of California, in discussing a similar question, said, in part: ''During the examination of the jurors impaneled to try the case, three of them gave contradictory answers to repeated questions put to them upon the subject of their ability to disregard opinions as to the defendant's guilt which they had formed from newspaper reports and public rumor, and from the fact that he had been held for trial, and to decide the case upon the evidence alone. Many persons, competent as jurors, have not given much attention to such subjects, are inexperienced as witnesses, and are unable readily to comprehend the force and effect of the language in which such questions are couched, and they generally answer without reflection as to the effect of their own words. Such contradictions are by no means infrequent, if, indeed, they are not the rule, rather than the exception. The trial court must decide which of the answers most truly shows the juror's mind. It should, of course, be liberal in giving the defendant and the people the benefit of· any doubts that may arise as to the fairness of the juror and his ability to lay aside preconceived impressions, and should excuse the juror if such doubt is created, but, where there are such contradictions, its decision is binding upon this court'' —citing many cases. (*People* v. *Ryan,* 152 Cal. 364, 92 Pac. 853.)

It is undoubtedly the rule that, where the evidence relat-
[2] ing to the qualification of a juror is in conflict, it is the
function of the trial court to pass upon that evidence and
determine the qualification of the juror, and this determina-
tion of the trial court is final, unless it appears from the
record that there has been some abuse of discretion. (See au-
thorities above cited.) "If, upon the whole examination of
the juror, it is manifest that the opinion formed by him from
reading newspaper accounts of the alleged crime, or upon
rumor, is merely hypothetical, or conditional on the truth of
the rumor of the newspaper reports read; that he has no set-
tled opinion as to the guilt or innocence of the accused; and
that he can render a fair and impartial verdict upon the evi-
dence adduced on the trial, under the instructions of the
court, the juror is competent." (*Basye* v. *State,* 45 Neb. 261,
63 N. W. 811.)

In *People* v. *Wolff, supra,* 182 Cal. 734, 190 Pac., at page
25, the supreme court, in discussing the qualifications of a
juror, said: "Juror Blaisdell testified that he knew nothing of
the case, except what he had read in the newspapers, that he
had formed an opinion therefrom which the evidence might
remove, but that, notwithstanding the opinion, he could, and
would, act fairly and impartially upon the charge against
the defendant, and be guided solely by the evidence produced
in court in arriving at a verdict. He further stated that he
would retain the opinion until he heard the evidence, that
after it had once gotten into his mind he could not put it
out until something occurred to change it, but that he could
go into the trial of the case presuming the defendant in-
nocent, and depend entirely upon the evidence introduced and
the instructions of the court in finding a verdict, and would
not in any way permit the matter that he had read in the
newspapers to influence his decision. The court, upon his
testimony, was justified in holding that the jurors were
qualified. A juror who has formed a tentative opinion in
that manner will usually say that it will require evidence to

change the opinion. That fact is not incompatible with ability to disregard such opinion entirely in weighing the evidence and to render a verdict solely upon the evidence. This psychological fact was recognized by the legislature, and section 1076 was enacted to avoid the necessity of sustaining challenges for actual bias in such cases. Its effect is that this state of mind does not disqualify the juror, if, notwithstanding such mental condition, he can and will act impartially and fairly in the case.''

The former decisions of this court in construing and analyzing this section of the Code have not been either reversed or modified, but stand as the law of this state, and, as appears from the authorities above referred to, are sustained by the decisions in other jurisdictions. (*State* v. *Sheerin,* 12 Mont. 539, 33 Am. St. Rep. 600, 31 Pac. 543; *State* v. *Howard,* 30 Mont. 519, 77 Pac. 50; *State* v. *Mott,* 29 Mont. 292, 74 Pac. 728.)

The district court did not err in overruling the challenge of the defendant to the juror William Davis.

The views above expressed, relative to the qualification of the juror William Davis, dispose of appellant's assignments of error Nos. 1, 2, 3, and 4. His assignment No. 5 is also based upon the alleged disqualification of the juror and the further intimation is contained in his brief that the court had acted in a partial manner and had, in effect, insisted upon the juror qualifying himself. We find nothing in the record sustaining this charge.

In assignment No. 6 the appellant maintains that the court [3] erred in sustaining objection to the question asked on cross-examination of the state's witness, Mrs. Gibson. The witness had been cross-examined at great length respecting her relationship with the defendant, and her feeling toward him, and the frequency with which she had met him. In answer to these questions, she stated that nearly every time she saw him she had forbidden him to speak to her, and had told him not to see her any more—not to come near her any more;

but she was further pressed with questions, and the counsel asked, "What did you say to him?" She answered: "I said for him not to come around; I was through with him; I didn't want nothing to do with him." "You told him you were through with him?" "Yes, sir." "What did you mean by being through with him?" Objection was made to this latter question as not proper cross-examination and that it was incompetent, irrelevant and immaterial. The objection was sustained. Counsel in his brief has not enlightened us in what way or manner, if at all, the defendant's case was, or could be prejudiced by the action of the court in sustaining this objection. It is intimated in defendant's brief that the witness may have meant that a promise of marriage between the witness and the defendant was terminated or that she did not want any more of defendant's property. Even conceding this to be the meaning, it was wholly immaterial and irrelevant to any of the issues of the case; but, in the light of her previous testimony just given, we cannot conceive how the jury could be in any manner mistaken as to what she really meant. The court permitted the defendant to prosecute a wide range of cross-examination, covering more than 100 pages of the transcript, in which it would seem, from an examination thereof, that every conceivable question touching relationship existing or supposed to exist between the witness and the defendant, either social or financial, had been fully examined. We are not able to find any error in the action of the court in sustaining this objection.

Assignment No. 7 is based upon a ruling of the court in [4] sustaining an objection to the question asked of the defendant's witness Antone Dilger, as follows: "Did you have any conversation with Mr. Gibson in his lifetime, preceding the twenty-ninth day of September, 1920, concerning himself and his wife, May Gibson?" This question was objected to as incompetent, irrelevant, immaterial, as calling for hearsay and not within the issues of the case. The objection made was sustained. Following this question the counsel for defendant

asked another question of the same import, and, upon objection, he was required to make an offer of proof. From the form of the question asked and the statement by counsel as to what he expected to prove, we believe the question was open to all of the objections made to it, and the court did not err in sustaining the objection.

By assignment No. 8 the appellant "contends that the verdict is contrary to the evidence in the case." Mrs. Gibson, called as a witness on the part of the state, testified, in substance: That she and her husband, Hugh J. Gibson, the deceased, formerly resided at No. 12 Porphyry Street, in the city of Butte, Montana, and about three years prior to September 29, 1920, they moved to No. 2537 Harvard Avenue, outside the city limits. The defendant had frequently visited their home, both before and after they moved to Harvard Avenue; he had often given her money as presents or loans; she had forbidden him coming to her house, and had after that time accepted money or presents from him. Mr. Gibson was employed at a mine; carried his lunch with him, returning home in the evening. On September 29, 1920, witness left her house about noon and went to Butte. Before leaving she locked the door. The windows of the house were closed and the shades pulled about halfway down. On returning home at 4:45 P. M., she noticed that the window-shades had been pulled clear down and a window had been broken. Entering the house, she discovered that someone had been in there, and had left a rope on the dining-room floor and a butcher-knife on a chair. The knife had been taken from her cupboard. About three minutes after entering the house she saw defendant standing in the kitchen doorway, and said, "My God! What are you doing here?" In reply defendant said, "I have come to kill the two of you," and drew a gun on her. She left the room, and he followed and demanded that she "take that off," and immediately caught her by the neck, took her into the bedroom, threw her on the bed, and choked her. She got loose from him and went into the

[61 Mont. 413.]

kitchen. Defendant took Gibson's pistol from under the pillow on the bed, put it in his pocket, and followed witness into the kitchen, again caught her by the neck, choking her, and scuffling with her. In a few minutes she saw Mr. Gibson coming and said, "Here comes Hughie." Defendant stepped back into the bedroom doorway. Witness opened the outside kitchen door and her husband stepped in. Defendant, holding a gun in his hand, said to Gibson, "Hands up! I have come to tell you about your wife." Gibson said, "Put your gun down and I will talk to you." Thereupon Gibson set his lunch bucket on the table and defendant fired at him. Gibson stepped out through the back door followed by defendant. The men clinched. Witness ran out of the house, saw the men struggling, heard three other shots fired, saw her husband fall, and saw defendant fire two shots at him after he had fallen. She then ran down the alley, followed by defendant, who fired at her, hitting her in the hip, and causing her to fall. While she was lying on the ground, defendant fired two more shots at her, and missed. Defendant then passed on. The witness further testified that Mr. Gibson died that same evening as a result of the wounds inflicted on him by the defendant, and this portion of her testimony is corroborated by the testimony of the attending physicians, Drs. Kane, Lilly and McCarthy.

The testimony of Mrs. Gibson as to what occurred after the men passed out of the door is corroborated in many substantial particulars by the witnesses Mrs. Bridget Scott and Elmer Cabbage, who were eye-witnesses to a part of the occurrences which took place at that time. About two hours after the shooting of Mr. Gibson, the defendant appeared at the store of Mr. Assad, situated at 3106 Floral Avenue, Butte, seemed to be in a hurry, and asked if he could borrow Assad's "army pants." He was told to go in the house and get them, which he did, putting them on. He then appeared again at the store, bought two loaves of bread, and left, saying that he was going on a fishing trip. Between 9

and 10 o'clock that evening the defendant was apprehended and arrested by the officers about four miles east of the city of Butte, on the Northern Pacific Railroad track. At the time of his arrest he had on an army uniform; had with him two loaves of bread, and a 32-caliber automatic pistol. He did not have any fishing tackle with him. Defendant, when searched, was asked if he had any other gun, and replied that he had had another gun, but had thrown it over the bank, and stated that it was the gun he got under the pillow in Gibson's house, and that it was Gibson's gun.

This evidence, introduced by the state, is sufficient to sustain a verdict of guilty, unless the evidence on behalf of the defendant is so overwhelming as to practically destroy the evidentiary value of the state's evidence. The witnesses called by the defendant gave evidence as to the social relationship between Mrs. Gibson and the defendant and as to presents made by defendant to her, and as to fragmentary parts of the conflict between the deceased and the defendant, as to alleged contradictory statements made by Mrs. Gibson, and alleged statements made by deceased after he was shot. The defendant himself, appearing as a witness in his own behalf, testified that he was at the Gibson residence on the evening in question, but that he went there upon the invitation of both the deceased and Mrs. Gibson, for the purpose of making some financial settlements with them, reaching the house a few minutes before the deceased appeared; that he did not assault Mrs. Gibson; that when the deceased appeared in the door he called the defendant a vile name; that Mrs. Gibson then handed the deceased a pistol, and that the defendant, in his own necessary self-defense, attacked the deceased and endeavored to take the pistol from him; that in the struggle that ensued, both within the house and after they had passed to the outside, the pistol was discharged. The defendant admits that he pursued and shot Mrs. Gibson. The evidence offered on the part of defendant is not of an overwhelming character; in fact, it is of such a character that the court would have

been justified in submitting the case to the jury, had the prosecution offered the evidence given by the defendant and his witnesses as the state's evidence and none other had been offered.

Defendant's specifications of error 9 and 10 are general in character; the former alleging error in overruling the defendant's motion for new trial, and the latter alleging an abuse of discretion in refusing to grant a new trial.

We have not been able to find any substantial error by which the defendant was in any manner deprived of his right to a fair and impartial trial, and therefore recommend that the judgment and order appealed from be affirmed.

PER CURIAM: For the reasons given in the foregoing opinion, the judgment and order appealed from are affirmed.

*Affirmed.*

Rehearing denied December 24, 1921.